IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MICHAEL A. TEAGUE,<br>       Plaintiff,<br><br>v.<br><br>CAROYLN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br>       Defendant. | Case No. 4:15-cv-04120-JEH |

**Order and Opinion**

Now before the Court[1] is the Plaintiff's, Michael Teague, Motion for Summary Judgment (Doc. 12) and the Commissioner's Motion for Summary Affirmance (Doc. 15).  For the reasons set forth below, the Court REVERSES the decision of the Commissioner to deny Michael Teague's benefits and REMANDS this matter for further proceedings consistent with this Order and Opinion.[2]

**I**

In September 2012, Michael Teague filed his application for Supplemental Security Income (SSI) benefits, alleging a disability onset date of May 19, 1992. (AR 174-79, 189). After an initial denial of his claim in November 2012 (AR 95-98), Teague requested reconsideration of his claim and was denied again in April 2013 (AR 104-07). Mr. Teague then filed a Request for Hearing by Administrative Law

---

[1] The parties have consented to jurisdiction by the United States Magistrate Judge. (Doc. 11).
[2] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears as (Doc. 6) on the docket.

1

Judge (ALJ) (AR 109-11). A video hearing was held before ALJ Susan Sarsfield on February 3, 2014 (AR 62, 144)[3] and continued on April 23, 2014 (AR 29), in Peoria, Illinois, where Teague was represented by counsel. The Claimant and his counsel were in Davenport, Iowa during the video conference. (AR 29). A vocational expert (VE), George Paprocki, testified. Following the hearing, Teague's claim was denied in the ALJ's unfavorable Decision on May 19, 2014. (AR 8-22). Teague appealed the decision to the Appeals Council, and the Appeals Council denied his request for review on June 23, 2015. (AR 1-4). Teague filed the instant civil action seeking review of the ALJ's Decision on August 24, 2015. (Doc. 1).

## II

At the time he applied for SSI benefits in September 2012, Teague was a 22 year old male living in East Moline, Illinois, in an apartment with his grandmother and two sisters. (AR 175). He has never worked. (AR 201). Teague claims he has been disabled since May 19, 1992, the date of his birth. Teague received childhood disability benefits, but the folder related to his childhood disability could not be located; neither the ALJ nor the Court has access to the folder. (AR 190). On Form SSA-3368, the Claimant reported that he cannot read or write, and is bipolar. (AR 193). His highest educational level is 11th grade.[4] Although he reported on this form that he never attended special education classes, the record shows that he was in special education classes during school. (AR 38, 194). He reported that he takes Adderall prescribed by the Robert Young Center in Moline, Illionis (AR 195) where he received mental health treatment from 1997-2012. (AR 197). Throughout

---

[3] On the record, it appears that the Claimant was unable to have a full pre-hearing conference with his counsel in this matter as the Claimant was detained in a correctional institution. (AR 62-64). At the first hearing, only the VE testified.
[4] The Claimant testified that he does not have an 11th grade education. (AR 37).

the record, Teague claims he has been prescribed a number of medications for his mental health issues.

On Teague's Form SSA-3369, his grandmother remarked that he was sick from birth and has anger problems and ADHD. (AR 207). She also reported that he is unable to work due to his lack of schooling and illness. (AR 207, 209). His grandmother reported he has the following problems with his mental condition: memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (AR 214). She reported that Teague does nothing but eat, sleep, and walk around the house. (AR 210). She also wrote that he has nightmares and sees things. (AR 210, 215). Teague also reported having problems sleeping because of voices and nightmares, along with tiredness and fear of the dark. (AR 220, 227, 232).

Teague is capable of some personal care such as bathing and dressing if he is in a good mood. (AR 210). He doesn't do yardwork because he doesn't know how. (AR 212). He reports he cannot complete house or yard work because he cannot focus. (AR 229). He also cannot drive because he doesn't know how. (AR 212). Although he can count change, his grandmother reports that he cannot pay bills or otherwise handle money because he has never done these things or been on his own. (AR 212). He reported that he can, however, make a sandwich every now and then. (AR 228). He watches TV and plays music. (AR 213). He plays video games and watches TV, mostly involving killing. (AR 230). Every other day when he feels like killing someone, he will hook up his video game and kill a zombie. (AR 230).

Further, Teague reported that he goes off like a bomb when he is stressed. (AR 232). He reported that he doesn't like anyone besides his grandmother and his aunt. (AR 231). He is "always in a bad mood [and] just doesn't want to be

bothered by people." (AR 231). His grandmother also reported that he has social limitations because he has been so confined all his life.

Teague has been treated at the Robert Young Center, although the treatment appears to be sporadic. In 2012 he was diagnosed with an antisocial personality disorder and a Global Assessment of Functioning (GAF) score of 41. (AR 328). The Commissioner requested a psychological consultative examination in 2012. Dr. Thomas Dhanens, Ph.D., the examiner, found problems with math and spelling. Although Dr. Dhanens did not observe a conduct disorder, he observed attitude and personality problems. (AR 342). Dr. Kirk Witherspoon, Ph.D., was referred for an evaluation. Dr. Witherspoon administered a Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) intelligence test and found a full-scale IQ of 62, verbal comprehension index score of 63, and perceptual reasoning index score of 58. (AR 348). His working memory index score was higher at 71 and processing speed index score was 81. *Id.*

At the hearing before the ALJ on April 23, 2014, Teague testified that he was "locked up" after starting his freshman year in high school, and his classes in the jail were not substantial. (AR 37). After prison he was expelled and could not get accepted into any alternative schools. (AR 28). He stated that although he tried to read in prison, he was told he could not read. (AR 38). He testified that he was in special education classes for all of his classes during school. (AR 38). He stated that he never had a job because nobody would give him one, although he admits he never applied. (AR 38-39). He testified that he sometimes worked odd jobs such as raking, mowing lawns, and shoveling snow for money. (AR 39). According to Teague, he has problems completing tasks such as mowing lawns because he cannot follow directions. (AR 39-40).

The Claimant testified about his legal troubles. At the time of the hearing, he had recently been to prison for violating probation for armed robbery. (AR 40).

4

He testified that he had been in and out of jail since the age of 14 due to his anger issues. He testified that he would "black out." (AR 40). He testified that during this time he heard voices and eventually received medical treatment. (AR 42). At the Robert Young Center, his doctor prescribed three different medicines and was told he had bipolar and schizophrenia. (AR 52). Teague testified that if he becomes angry around his grandma and will punch holes in the wall. (AR 43). Afterwards, he tries to fix the holes or anything else he broke when he was angry. (AR 52).

At the hearing, the Claimant also testified that he gets tired, and while at the youth center, he was left in his room all day except for when he would go to school there. (AR 47). He testified that while there, in his room, he would just talk to himself, because that's all he could do. (AR 47-48). He does not have difficulty leaving the apartment by himself, and sometimes goes to the park. (AR 48). He can clean his room and go to the store with his grandmother. (AR 49). He can also carry the bags inside afterward, and sometimes he even goes to the grocery by himself. (AR 50). Otherwise, he has no other hobbies and does not participate in any outside activities. (AR 50).

After listening to Teague's testimony, the ALJ posed his hypothetical questions to the VE, Brian Paprocki. The ALJ asked the following:

> **Q** . . . I'd like you to consider a hypothetical claimant of the same age, education, and having the same past work experience as this claimant limited to simple, routine, repetitive tasks learned by short demonstration only. He requires brief superficial interaction with co-workers and supervisors, no tandem tasks, and no interaction with the public, and he requires jobs that measure productivity on an orderly basis. He can have only occasional change in work processes and procedure. Is there any work activity that he could perform?
> **A** I testified in this case before, didn't I?
> **Q** Yes you did.
> **A** Could you tell me what my testimony was and the jobs I gave?
> **Q** Okay. At that time, the hypothetical was simple, routine, repetitive, brief superficial interaction with co-workers and supervisors, no

tandem tasks, no interaction with the public and you testified that the hypothetical claimant could perform the light job of assembler such as toy assembler or plumbing hardware assembler, house cleaner, and injection mold operator. With the additional limitations that I've posed including short demonstration only, production measured on a daily and not hourly basis and no more than occasional change in work processes and procedures, could he still perform those jobs?

(54-55). The VE responded that under the hypothetical, that individual could work as a house cleaner, assembly job, injection molder, construction worker, or cook helper.

The ALJ added an additional limitation, that the "claimant could not concentrate and attend to job tasks more than 15 minutes at a time without being distracted for two to three minutes at a time." The VE responded this limitation would not preclude employment. (AR 56).

The Claimant's attorney asked the VE whether a hypothetical claimant with the same limitations along with a social limitation of "not consistently going to be able to respond appropriately to instructions or to criticism." (AR 57). The VE answered that there was very little tolerance at an unskilled work setting for this kind of response. (AR 58).

### III

In her written Decision, the ALJ applied the standard five-step sequential evaluation process and ultimately found that Teague was not disabled. The ALJ determined that Teague satisfied step one because he had not engaged in substantial gainful activity since September 5, 2012, the application date. (AR 13).

At step two, the ALJ found that Teague had the following severe impairments: schizoaffective disorder, antisocial personality disorder, history of attention deficit hyperactivity disorder (ADHD), history of explosive disorder, and history of conduct disorder. (AR 13). In finding these impairments, the ALJ

considered the statements and opinions from Dr. Witherspoon's consultative examination and psychological evaluation. Dr. Witherspoon administered the (WAIS-IV) and found that the Claimant had a full scale IQ of 62, a verbal comprehension index score of 63. (AR 13). However, the ALJ discounted the scores, finding that Teague's high school records did not indicate that he has an intellectual disability. Although the records indicate that the Claimant was placed in special education, his primary disability was described as "Other Health Impairment," focusing on his behavioral problems. Further, the ALJ found that although the Claimant alleged illiteracy, the school records do not indicate that he had issues with literacy. The ALJ also referenced the Claimant's activities of daily living (ADLs) to support her determination that he functioned "at a much higher level than one would expect with a diagnosis of mental retardation." (AR 14).

At step three, the ALJ found that the medical evidence did not establish that Teague's impairments met or medically equals the severity of a listed impairments, either individually or in combination. (AR 14). Specifically, the ALJ found that the Claimant did not meet the mental listings of 12.02 (organic mental disorders), 12.04 (affective disorders), or 12.08 (personality disorders). (AR 14). Remarkably, the ALJ did not mention Listing 12.05 (intellectual disability) in her Decision. The ALJ also found that Teague has a mild restriction in activities of daily living and moderate difficulties with social functioning. Further, the ALJ found that the Claimant has moderate difficulties with regard to concentration, persistence, or pace. (AR 15).

> In her RFC determination, the ALJ determined the following:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine repetitive tasks learned by short demonstration only; limited to brief, superficial

7

>interaction with coworkers and supervisors; no interaction with the public; no tandem tasks; jobs with productivity measured on a daily and not hourly basis; and no more than occasional changes in work processes and procedures.

(AR 16). In formulating that RFC, the ALJ discussed some of the evidence of record regarding Teague's mental impairments, but not his intellectual impairments. The ALJ also noted that the Claimant has never worked, and mused whether his current unemployment is truly the result of medical problems. (AR 17).

The ALJ found that Teague may not be credible. The ALJ discussed Teague's failure to take his prescribed psychotropic medication. Teague testified at his hearing that he had not even obtained his medication. The ALJ determined that this harmed Teague's credibility because he did not attempt to alleviate his condition with medication. Moreover, the ALJ concluded that Teague has exaggerated symptoms and limitations. For example, Teague testified that he never filled out an application because he cannot read and he believed he would not be hired. Also, the ALJ determined that although his records document that he had "strong difficulties with reading," the records did not document the illiteracy reported by Teague. Further, the ALJ found that some of his mental health claims, such as his alleged hallucinations, were not genuine: Teague once admitted at an intake screening at a youth center that he really was not hallucinating. Accordingly, the ALJ concluded that the objective evidence on record does not show that Teague's alleged schizoaffective and antisocial personality disorder, history of ADHD, history of explosive disorder, and history of conduct disorder, were disabling mental functional limitations that would prevent substantial gainful activity. The ALJ gave some weight to the findings of the non-examining physicians employed by the State Disability Determination Services, who found Teague not disabled.

8

Finally, the ALJ discounted Teague's GAF score of 41 and 45 by mental health planners and Eric Meyer, APN, with the Robert Young Center. The ALJ found that these sources were non-acceptable medical sources. Further, the ALJ stated that the scores appear to be based entirely upon Teague's history and subjective statements, as Teague appeared to have few if any abnormalities. The ALJ also found that Teague's well-groomed appearance, average eye contact, clear speech, cooperative behavior, euthymic mood, full affect, and logical thought processes, when combined with his variety of ADLs, did not support a low assessment of adaptive functioning. (AR 20).

At step four, the ALJ determined that Teague has no past relevant work. (AR 20). At step five, the ALJ determined that Teague could perform a significant number of jobs that existed in the national economy. (AR 20).

## IV

Teague argues that the ALJ erred in the following ways: 1) the ALJ's finding that Teague neither meets nor equals any listed impairment is not supported by substantial evidence; and 2) the RFC determination is not supported by substantial evidence. (Doc. 13).

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. See 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;
2) suffers from an impairment that is severe or whether a combination of her impairments is severe;
3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any

point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, the Claimant alleges error at step three and step four.

## V

### A

Teague argues that substantial evidence supports a finding that he meets a listed impairment. He claims that according to the medical evidence and consultative examination findings, adaptive deficits prior to the age of 22, his IQ scores, illiteracy, ADLs, and other severe impairments, he meets the criteria for Listing 12.05 (intellectual disability). (Doc. 13, p. 12).

The Commissioner counters that the Claimant's IQ score alone does not satisfy the two part requirement of Listing 12.05 for intellectual disability. According to the Commissioner, the ALJ provided an adequate explanation of her finding and substantial evidence, such as the medical opinions and activities of daily living (ADLs), support the ALJ's Decision.

According to the Social Security Administration (SSA), intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . .before age 22." To be found disabled under Listing 12.05 (intellectual disability), a claimant must demonstrate that his or her impairment satisfies the preceding diagnostic description *and* one of the subsidiary paragraphs A, B, C, or D, which contains four sets of criteria that an

impairment must satisfy in order to "meet" the Listing. 20 C.F.R. Pt. 404, Subpt. P., Appx., § 12.00. For paragraph C, the ALJ:

> will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

*Id.*

### i

In step two, the ALJ briefly discussed Teague's IQ scores and intellectual disability. Because the ALJ did not discuss intellectual disability at step three, the Court will first address the ALJ's discussion at step two.

Step two is "merely a threshold requirement." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015), quoting *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010) (citation omitted; quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)). SSR 96-3p provides that if an individual's impairment does not appear from the objective medical evidence to be severe, then the ALJ must consider the limitations and restrictions caused by the individual's symptoms. *Id.* at 649. Critically, "[i]f these additional considerations cause 'more than minimal effect on an individual's ability to do basic work activities, the ALJ must find that the impairment(s) is severe *and proceed to the next step in the process* even if the objective medical evidence would not in itself establish that the impairment(s) is severe." *Curvin*, 778 F.3d at 649, quoting SSR 96-3p (emphasis in original).

An error at step two can, however, nevertheless be harmless, provided the ALJ considers all of a claimant's severe and non-severe impairments when

determining the RFC immediately after step three. *Curvin*, 778 F.3d at 649. However, if an ALJ fails to factor those severe and non-severe mental limitations into the RFC, then the error cannot be harmless. *Ramos*, 674 F. Supp. 2d at 1091.

The ALJ erred in her finding that Teague's mental impairments did not include intellectual impairments because she did not provide logical explanation for why Teague's intellectual disability did not meet the minimal threshold requirement. For the following reasons, on remand, the ALJ should reconsider Teague's severe impairments at step two. Although the Court may overturn the final decision "only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review," the ALJ has precluded meaningful review due to the lack of discussion of Teague's intellectual disability. *Buckhanon ex. rel. J.H. v Astrue*, 368 F. App'x 674 (7th Cir 2010), citing Hopgood, 578 F.3d at 696, at 698 (7th Cir. 2009). Further, the ALJ did not support her conclusions with substantial evidence.

The ALJ discounted Teague's well below average IQ scores, finding that Teague's high school records did not indicate that he has an intellectual disability. The ALJ discounted the IQ scores because they were at odds with the high school records. However, on page 302 of the record, which is a page from Teague's Individualized Education Program at United Township High School, where Teague had a grade point average of 0.727 on a 4.000 scale (AR 292, 294), there is a note that Teague struggled academically and would fail any regular curriculum. Moreover, other evidence in the record indicates that his behavioral problems may be a result of a possible intellectual disability rather than the other way around: "Mike normally chooses not to do work rather than struggle through it. [Mike] has strong difficulties with reading which then influences most every assignment."(AR 280). Thus, because the records are not at odds with the objective

evidence of an IQ evaluation, the Court finds that the ALJ's explanation is insufficient.

The ALJ posits that although the records indicate that the Claimant was placed in special education, his primary disability was described as "Other Health Impairment," focusing on his behavioral problems. The Court notes that the "primary" disability is Other Health Impairment, and no secondary disabilities are listed, and "Other Health Impairment" is not defined. (AR 278). The same records indicate that in addition to a behavior intervention plan, Teague also had a class aide. *Id*. The evidence from Teague's high school reports indicate that there is more than a severe behavioral impairment. Therefore, the ALJ's explanation is not sufficient to support her finding.

The ALJ also found that "there is not a consistent diagnosis of mental retardation"[5] and because of Teague's ADLs, which suggest greater adaptive ability, the ALJ did not conclude that the claimant is "mentally retarded." (AR 14). Here, the ALJ improperly played doctor. Besides the medical evidence, the ALJ lists all of Teague's ADLs that she finds are contrary to what a "mentally retarded" individual would be able to do. For instance, the ALJ mentions that he can walk to the park, hunt and go fishing, clean his room, shop with his grandmother, walk around the neighborhood, and take the bus. The ALJ also mentioned that Teague can do odd jobs when he needs money, although Teague did testify that he forgets instructions when he is asked to mow lawns. The Court is unable to follow the ALJ's logic in the analysis of this intellectual disability in step two. It is not clear how Teague's ADLs diminish the severity of intellectual disability. ALJs are not

---

[5] Since 2013, the SSA has replaced the term "mental retardation" with "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499 (Social Security Administration Aug. 1, 2013) (Final Rule), https://www.gpo.gov/fdsys/pkg/FR-2013-08-01/pdf/2013-18552.pdf.

meant to "play doctor" by making their own independent medical findings rather than relying on expert opinion. S*ee Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). However, here the ALJ is claiming that his activities contradict a diagnosis of mental retardation.

Furthermore, the error at step two is not harmless because the ALJ did not discuss any intellectual impairments in her RFC determination at step three. Because the ALJ failed to factor both severe and non-severe mental limitations into the RFC, then the error cannot be harmless. *Ramos*, 674 F. Supp. 2d at 1091. The only related discussion to intellectual impairments that the ALJ offers is a short explanation of her finding that Teague is not illiterate. The ALJ stated the following: "Although his education record do show a history of special education and 'strong difficulties with reading,' the records do not document the sort of near-illiteracy that he has alleged." (AR 18). The ALJ's explanation of Teague's literacy is supporting an assertion that Teague is not entirely credible, and ignores the high school records and other medical evidence.[6] Therefore, there is no analysis concerning Teague's non-severe intellectual impairments and how those factor into the RFC determination.

Certainly, an ALJ may not ignore entire lines of contrary evidence or selectively consider medical reports. *Myles v Astrue*, 582 F3d 672, 678 (7th Cir 2009); *Terry v Astrue*, 580 F3d 471, 477 (7th Cir 2009). Thus, because the objective evidence and high school reports show that there is a more than minimal effect on Teague's ability to perform basic work activities, the Court finds that remand is appropriate. *See Curvin*, 778 F.3d at 649.

### ii

---

[6] Specifically, Dr. Witherspoon found "mild mental retardation" in his report from 2013. Dr. Witherspoon also found that Teague's scores suggest possible "developmental unevenness but generally impaired cognition." (AR 348).

Teague argues that the ALJ erred in not finding that he met Listing 12.05. Because of the ALJ's error at step two, the Court is unable to find an explanation of Teague's impairments or symptoms that would lend to her lack of discussion of 12.05 at step three. In her Decision, ALJ does not mention Listing 12.05 (intellectual disability)[7] anywhere. In light of the Court's remand due to step two, should the ALJ conclude that Teague does not have a severe impairment concerning his intellectual disability, the ALJ should nonetheless determine whether or not Teague meets 12.05, in paragraph A, B, C, or D.

To illustrate, the ALJ's Decision and hypothetical to the VE demonstrate that she did find severe impairments that imposed an additional and significant work-related limitation of function. This meets part of the requirement for paragraph C. For example, the ALJ limited Teague by his inability to have regular interaction with others. (AR 54-55). This should have been addressed in the ALJ's Decision.

Additionally, the ALJ will revisit the other Listings. In his brief, Teague talks about his behavioral impairment evidence at length. (Doc. 13, pp. 17-18). Remarkably, the ALJ found moderate difficulties in the Claimant's social functioning with little explanation. On record, there is self-mutilation, head banging, and cutting (AR 319); a suicide attempt (AR 250); is explosive and emotional, with disruptive outbursts, does not work independently (AR 281); grabbed and threatened to rape female in school (AR 320); flattened the tires of someone who would not give him a ride in their car (AR 359); left the room during an evaluation (AR 360); and snaps at people and throws things (AR 362). Teague

---

[7] Teague's counsel brought the Listing and relevant paragraph to the ALJ's attention at the hearing. (AR 32-33). Further, on Teague's DIB Review Sheet, it states that Teague's secondary diagnosis is borderline intellectual functioning. (AR 184). Thus, the evidence was in the Claimant's records.

has been in and out of jail since the age of 14, testifying that he went to jail for anger problems and that he "used to get mad and fight and black out." (AR 40).

The ALJ need not provide a complete written evaluation of every piece of testimony and evidence, but she did need to build a logical bridge from the evidence to his conclusion. See *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014), quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Further, the Court cannot re-weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). However, without an explanation here, the Court cannot cross the logical bridge and find that the ALJ's Decision is supported by substantial evidence. The Court finds that the ALJ did not cite evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). See *Meuser v. Colvin*, ___ F.3d ___, at *6 (7th Cir. 2016) (explaining that an ALJ cannot disregard a claimant's limitations in his ADLs or ignore evidence in finding the claimant was mildly limited in social functioning).

### B

Similarly, Teague argues that the evidence used in determining his childhood benefits is necessary to evaluate the ALJ's determination, and establishes that the evidence demonstrates or supports onset of the impairment before age 22. However, the file was not part of the record. Moreover, Teague argues that the ALJ committed error because she did not mention the childhood disability benefits. The Commissioner responds that the folder is unnecessary.

According to the guidelines, a prior claim file is necessary when the claim involves a continuing disability review, a collateral estoppel issue, a reopening issue when the ALJ did not make a finding, a res judicata issue, findings of an ALJ or appeals council on a prior claim to comply with an Acquiescence Ruling, or fraud or similar fault. HALLEX I-3-2-22. The prior claims may be necessary if the

record "could make a difference in establishing whether disability is present in the current claim." *Id*.

According to the record, although it was requested, the location of the prior folder is "UNK," which the Court presumes means "unknown." (AR 190). It is unclear whether the ALJ was required to obtain the folder, and the ALJ never determined whether the folder was necessary in her Decision, likely because the folder was missing. While it is true that Teague did not appeal the cessation of benefits upon his 18th birthday, the records are certainly relevant when his alleged onset date is the day he was born and whether Teague meets a listed impairment. Although the criteria of childhood and adult benefits are not identical, a childhood impairment would contain evidence that would be helpful in evaluating Teague's past records. 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.987. As Teague alleged several impairments, particularly his behavioral and social impairments documented in the high school records, the folder would have provided some insight into the severity of the impairments, the medical history of the impairments, and even Teague's credibility.

The Commissioner also makes the argument that the Claimant did not ask the ALJ to reopen the final determination in 2010. This would, of course, not be reviewable by the Court. See *Califano v. Sanders*, 430 U.S. 99, 107-08 (1977). However, the Claimant is not arguing that the Court should find that the childhood benefits or disability redetermination process be reopened on remand. Instead, the Claimant argues that this should have been part of the record.

According to HALLEX I-2-1-10, the Administration should still have the records. HALLEX I-2-1-10. CLAIM(S) FILE, 1993 WL 751895, at *2. This is concerning to the Court, particularly when the records should have been retained per the guidelines, but if there is no folder to examine upon remand, then this is not reversible error, because an ALJ cannot evaluate a missing folder. However,

given that the lost file is due to the Commissioner's own negligence, any inferences the ALJ may make about Teague's childhood disability should be made in his favor; the Commissioner cannot use her own negligence to the Claimant's detriment.

## VI

Teague next argues that the ALJ's RFC determination is not supported by substantial evidence. (Doc. 13). Teague's Motion essentially argues the following: that the ALJ improperly discounted his mental health providers and his Global Assessment of Functioning (GAF) scores. Because of these errors, the Claimant argues that the ALJ's RFC is not supported by substantial evidence, particularly where it concerns the Claimant's mental health. Specifically, the ALJ cited Teague's literacy, lack of work history, and taking his medication inconsistently in her findings.

Conversely, the Commissioner contends that SSA policy indicates that GAF scores do not directly correlate to the severity requirement of Listing 12.05. With regards to the Claimant failing to take his prescribed medication, the Commissioner responds that the medical record, namely Dr. Dhanen's report, supports that Teague had no intolerable side effects of the medication he used to treat his mental impairments. Instead, the Plaintiff, argues the Commissioner, does not provide reasons why he will not take his prescribed medication.

As the Court has already determined that the ALJ's errors at step two and three merit a remand, the Court will not discuss the RFC determination at length. It is noteworthy that Teague testified that he doesn't like hospitals because he cannot fill out the paperwork. Teague also testified that he just recently had been prescribed the medicine a few days prior to the hearing. He also testified that he had not picked up his medication because, "I haven't had anybody to get it." (AR 44). Presumably, Teague needed someone to drive him because it is well

established that he cannot drive. According to the record, he doesn't like his psychotropic medications, and he described them as making him feel "weird and mellowed out," noting that he did not like it. (AR 362).

On remand, the ALJ should re-visit the other steps, which includes the RFC determination in evaluating whether Teague qualifies for disability.

## VII

For the reasons stated herein, the Court REVERSES the decision of the ALJ and REMANDS this case pursuant to Sentence 4 of 42 U.S.C. § 405(g)("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing").

The Plaintiff's, Michael A. Teague, Motion for Summary Judgment (Doc. 12) is GRANTED and the Commissioner's Motion for Summary Affirmance (Doc. 15) is DENIED.

This case is terminated.

*It is so ordered.*

Entered on November 1, 2016.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE